We'll turn to the first case on our argument calendar, and it's Vaad v. Quixote. Thank you. You may proceed. Good morning, Your Honor. My name is J. Christopher Jensen of the law firm of Cowan, Leibowitz, and Lattman, P.C., and I represent the cross-claim plaintiff and appellant and also cross-appellee in this action. I want to first address my appeal to this Court. We raise one issue on this appeal, which is whether or not the district court abused its discretion in denying my client a prospective injunction after trial to prevent the further dissemination and sale of books bearing my client's Quixote logo trademark. I have in my hands one copy of a volume of these books that is published by my client and a copy that is published by the cross-appellant Vaad. I'll refer to my client as Mercos. Mercos publishes these works and has published similar works for over 75 years under this Quixote logo that is displayed on the spine of its publication. Almost 80 percent of the books that it publishes bears this logo. Over the course of these 75 years, Mercos has published over 2,000 titles. Literally tens of millions of books have been sold, the majority in the United States but throughout the world, by the Mercos organization. Mercos was formed in 1942 by the previous Rebbe who led the Chabad-Lubavitch movement and brought it to the United States. And it was intended to operate as the educational and publishing arm of the Lubavitch movement. And it did so under the previous Rebbe and then, following his death in 1950 until 1994, under the auspices of the Rebbe, the revered religious leader who is revered not only within the Chabad community but also in the larger Jewish community. Their position is that even though they use the identical trademark on the identical publication of Vaad's position, I'm sorry, my opposition's position, I'm sorry, Your Honor, Vaad's position I'll refer to the opposition as Vaad, Vaad's position is even though it uses the identical trademark on the identical publication sold in the same channel of trades to the same consumers that there will not be inevitable public confusion. We oppose the application of the doctrine of latches in this case and that is the sole basis for the district court's denial of our request for an injunction. On the grounds that there will be, has been, and will continue to be inevitable public confusion resulting from the identical use of the trademark, an identical trademark on identical publications. The district court . . . The district court adopted a very severe test from a northern district of New York opinion as the standard for overcoming latches by reason of public confusion. Are you going to address that? The district court took the view that latches was not overcome either by our first argument which is inevitable confusion based essentially on some testimony that it elicited at a trial from one of the witnesses who said, yes, there are people in the Chabad community who may know the difference between these publications. Based on that testimony alone, the district court said, I don't believe, and also I should say on what the district court considered to be the absence of sufficient evidence of actual confusion . . . I was addressing something slightly different from what you . . . Yes. I'm talking about the test that the district court used to determine whether public confusion, the risk of public confusion or actual public confusion would overcome a defense of latches and the district court adopted a test, if I remember correctly, that what was needed to overcome latches by reason of public confusion was inevitable public confusion as shown by clear and convincing evidence of actual confusion. Yes. No. That's correct, Your Honor. This court has . . . I don't think there's any . . . that this court, there's no source in this test for that question. No. This court has long recognized that in deciding whether or not to apply the doctrine of latches, you must take into account the public's interest in not being deceived or confused, but there's been no test that this has to be established, as you said, by clear and convincing evidence that actual confusion is resulting. So, apart from the fact that there has been no test, this court hasn't adopted that test, but that doesn't mean the test is wrong. Is the test right or wrong? No. I think the test is wrong. What this court has said in other contexts is that when you have an identical trademark on identical goods sold to the same consumers, as a matter of law, there's likelihood of confusion and we would argue in this context there is also going to be inevitable public confusion. Have we ever said that in a case where the allegedly confusing works have been sold for many years and there's virtually no evidence of confusion? In the Air Maze case, which is the case that we rely on, this circuit looked at a situation where a defendant was creating Air Maze knockoff bags and was advertising to the public that these were knockoffs. They were not legitimate Air Maze merchandise and was selling it that way for, I think, between nine and 19 years. And then Air Maze finally brought suit to stop that, arguing that there was a likelihood of post-sale confusion. And this court said that in that context, public confusion was inevitable because there was the identical trade dress, if you will, on the goods being offered to the same consumers. And even though the purchasing consumers might not be confused, there would be post-sale confusion because people would see the bag and think that it was an Air Maze bag. And that period of latches far exceeded the period of latches in this case. But the court was enforcing this public right not to be confused. Was there bad faith in Air Maze? Yes, there was, as there is in this case. But the finding here is that there's not bad faith, right? The finding in this case . . . You allege bad faith. Yes. The district judge, as the trier, found there was not. The district court found that there was no bad faith based upon their religious belief that the Rebbe's permission having been granted them could never be revoked. But this court addressed that issue in a prior case that my clients had before this court where there was the same argument made by another party that they had the religious right based on opinions of rabbis and based on a bet-then decision to continue to infringe the copyright in another work that Miracles published. And in its opinion, this court said, no, that cannot be. Because we have to enforce the secular law. And in . . . I understand there's a, to put it mildly, big religious dispute lurking in this case. But when a district judge makes a finding that a party is in good faith, can we reject it on any basis other than saying it's clearly erroneous? No, the clearly erroneous standard would apply, and we say that it is clearly erroneous. Because it is conceded that they are deliberately and intentionally using the mark. They say in their complaint that it's necessary for them to associate their publications with this symbol and the goodwill that it represents as a way of telling the public that their works are consistent with the views of the Chabad community and of the Rebbe. Bad faith can influence a judgment against a party for a very good reason, but it doesn't really have much to do with whether there's going to be misleading of the public. And there can perfectly well be misleading of the public in the absence of bad faith. Well, the district court ultimately found that the public was misled and that there was a likelihood of confusion. My point simply is that if there is intentional infringement, as this court has said in a number of decisions, the doctrine of laches a priori simply cannot apply because you come seeking equitable relief with clean hands. And if you are intentionally infringing, intentionally using the mark to try to capitalize on somebody else's goodwill in that mark, you're not entitled to invoke the doctrine of laches. The court of your evidence is that they set up a mobile stand directly in front of— They claim publicly that they are Quixote. They said so in their testimony. They claim publicly that they what? That they are Quixote, that they are the Quixote Publications Society, that they are my client's organization. They sell once a year from a truck in front of our headquarters books with the giant Quixote symbol on the side of the truck. They use the Quixote symbol on all of their advertising on the internet and refer to themselves as BOD slash Quixote. How long have they been doing that? They've been doing that since 1995 or 7 in that time frame following the Rebbe's passing in 1994. That's at least 20 years? Yes. We've been in litigation with them since 2003. In all that time, who's been confused? We've offered evidence at trial of actual confusion. The district court gave it very little weight because of the district court's view that it was somehow hearsay to have emails from people who were seeking to purchase their publications from my client. What's our standard of review in order to reject his finding that there's virtually no actual confusion? The standard of review is the factual finding is clearly erroneous, but we're saying something different. We're saying as a matter of law, if there was intentional infringement- In addition, the district court relied on an incorrect application of a rule of law to discredit your evidence saying that something was hearsay when it wasn't hearsay. That's part of what we're saying. That would be a legal error. We also say the court below committed a legal error in not recognizing that if you avow an intention to use the trademark, to capitalize on the goodwill of the trademark owner, you are deliberately infringing and under those circumstances not entitled to invoke the doctrine of latches. What do you say about the claim of third-party usage during all these years? The court recognized ultimately that that was just wrong. One witness had said, oh, there's lots of books that have this logo on it without any testimony at all about these books, where they're sold, how they're sold. Some of these publications dated back to the 1940s and 50s. In order to show that third-party uses weaken a mark, you have to show how they're sold, how many copies are sold, whether or not the relevant consumers would know about these uses and that it would have some effect on the public knowledge or understanding of this mark. Again, what you just said, are those arguments for the trier in deciding whether there's been third-party usage or are they legal arguments that we can consider? With respect to that, I would say that it's a legal argument. In other words, the court was clearly right that as a matter of law, you cannot establish that a mark is weakened by third-party use when you've made no proffer of evidence as to what that use is or the extent of that use. I thought your point was there's some evidence of third-party usage, but it's not particularly persuasive evidence. There was no evidence as to the scope of the use. Not the scope? Yes. Well, that goes to wait, doesn't it? Well, I think this court has said it in a number of decisions. Without evidence as to how the public perceives this third-party use, you simply don't have a case to argue that the mark has been weakened by the third-party use. It's not just a matter of wait. Thank you, Your Honor. Thank you. We'll reserve two minutes for rebuttal. We'll hear from Vaught. May it please the court. My name is Mark Weissman from the law firm Hertzfeld & Rubin. I'm here for the appellee, cross-appellant Vaught Lehafotas Sijhos. The exception to latches espoused by my adversary on appeal is really a public interest exception. They need to show injury to the public caused by confusion, not by confusion, not just by likelihood of confusion. And whatever various terms that have been used by various courts, inevitable confusion, latches may only be overcome by the showing of compelling public interest. And Merkos, my adversary, has not come close to showing that in this case. What they're arguing is really likelihood of confusion. And they say, oh, there's really, in this case, a really, really strong likelihood of confusion. Well, I mean, likelihood of confusion is a way of proving that there will be confusion. And I don't understand where the standard comes from that you just enunciated, that you can only show, as against a defense of latches, one can only overcome it with respect to confusion by showing clear and convincing evidence of actual confusion, such as to make the likelihood of confusion inevitable. Where does that come from? There is one northern district opinion which said that and the district judge adopted it, but that's not a standard that our court has adopted, nor do I think it should be the correct standard. So, if the district court used an incorrect standard, I mean, I'm not saying it's incorrect, I'm saying it seems to me to be incorrect, if we would not adopt that as the standard, what difference does it make what conclusion the district judge came to if he came to a conclusion based on a standard we would not adopt as the proper standard, apart from the fact that he also, that the district judge also discredited evidence on the mistaken belief that it was hearsay when it's not hearsay. Well, two issues there. The first issue, Your Honor, this court can affirm the district court's decision on any ground even if Your Honors find that the wrong standard was applied. What I would say is that the actual confusion question is certainly something that some courts including the northern district of New York in the Harley-Davidson case came to the conclusion of that high standard, but this court has never applied this exception to latches, whatever you want to call it . . . The question is largely open. Yeah. Well, there are other circuits that have considered the question. We have a case in the Ninth Circuit. Basically, the Ninth Circuit says, it's not about clear and convincing, but it says that if the person who has sat on his rights and latches is applicable, that person can only overcome latches if there's a showing of injury to the public in the realm of public health and safety. No, but, I mean, citing what other courts have said is a little bit helpful, but we don't adopt a standard just because the Ninth Circuit has said it. You have to convince us this is the right standard, not that some other courts have adopted it. So latches is an equitable concept. You don't want to reward the party that . . . Something else, which is evidence of actual confusion can be very difficult to come by, but there are circumstances in the trademark law where the proposition is so obvious that there will be confusion just because of the nature of the usual factors. When you look at the two, how can they not be confusing? And to say that one can't make a judgment that confusion is extremely likely because you don't have evidence of people who come and say, oh, yeah, I was confused, which is evidence here of actual confusion, and the district judge discredited it. I think that's . . . Well, the judge, whether it's hearsay or not, the judge was entitled to give it little weight, and part of the reason . . . Wait a minute. If a district judge says, I'm disregarding this evidence because it's hearsay when it's not evidence, when it's not hearsay, that doesn't justify the district judge giving it little weight. That's not giving it little weight. That's saying it's not admissible evidence, so I'm not going to consider it. Well, no, the reason he gave it little weight is because the individuals . . . let's say there were six emails from a four-year period, and then there were witnesses that testified, oh, I get a lot of complaints or I get a lot of . . . I hear a lot of confusion. The second category, which is essentially hearsay, I mean, how could a person testify, oh, some guy came to the bookstore the other day and told me he was confused. That's not probative evidence. The emails . . . What do you mean it's not probative evidence? We don't know why that person was confused. Lots of people walk around confused. The point here is that they have to be confused about . . . they have to look at the logo, the Keyhole logo, and say, this book . . . I'm confused that this book is a Mercos book. Wasn't there evidence that people came to ask for . . . came to the Mercos to ask for the Vaad? There were . . . there was six emails which indicated that a consumer was looking at a Mercos bookstore for titles that are associated with the Labovitcher . . . Why isn't that evidence of confusion? Because it's not surprising that somebody would go to a bookstore in the heart of the Labovitcher community and look for books that are associated with that philosophy. What they failed to prove was that there's any connection between that so-called confusion and the actual logo at issue here. There's no evidence in the case that anybody went to the bookstore because they saw the Keyhole logo and said, ah, this must be a Mercos publication. And in fact . . . What were they confused about? If they weren't confused about that, what were they confused about? Did they testify? No, they were not . . . there was no testimony from the people who were supposedly confused in the community. They were simply emails without any explanation as to why . . . what was motivating the confusion, which is what the court says is an essential . . . that is what the trademark is designed to protect, the source identification. Random confused people . . . and this is actually a fairly sophisticated community when it comes to this particular issue. Everybody in the market for these books, for the most part, knows about this dispute, knows that there's two public publishers. This . . . the demonstratives that my adversary showed you . . . So my client is the one that has been publishing these books. These are the Cjos, the talks of the Rebbi, for 70 years, using the Keyhole logo with the authorization of the Rebbi. Mercos only started publishing these books in the late 90s. If somebody came . . . if somebody is creating confusion here, it's Mercos. They started publishing books with the exact same color, the exact same content. They went to the PTO and you didn't. Well, they went to the PTO in 2001. What happened is the . . . for decades, this community was treating these marks essentially like a certification mark. This mark designates the imprimatur of the Rebbi and the previous Rebbi. Somebody got clever and they said, oh, maybe we should file a federal registration for the mark. Maybe they had some disputes with other people who were using the Keyhole logo. But they never went after my client until 2011. Even with the . . . we are the ones that opposed the trademark. They just filed for a registration. We opposed it. They never sued us until . . . They prevailed. What's that? They prevailed before the PTO. They did. They prevailed before the PTO. We say that was an error, but that . . . yes, they did prevail. You appealed it to the district court. Correct. Which I understand is the way to appeal . . . It's one way. . . . the decision of the PTO. Could you have appealed within the PTO? No, there's no . . . I don't think there's a . . . the process would be either going to the second circuit. I'm sorry, going to the federal circuit or going to district court. They appealed in a way that was perfectly reasonable. Yes. Correct? Didn't the district court in this case find that the PTO got it right? Yes. Where are we then? They got it right, but they can't enforce it because of latches. That's correct. I'm sorry, what they got right was that Mercos is entitled to register this keyhole logo, that they're the owner. The part that the PTO never decided was whether there was a likelihood of confusion in this case. In this case . . . They upheld their trademark. I'm sorry? They upheld the trademark.  Exactly. Right. There would be no harm . . . They didn't find out if you were infringing. They didn't decide that you were an infringer of their trademark. That's correct. What would be the harm to you if you began to use a trademark that was sufficiently distinguished from the other so that the public could recognize that there's a difference? These are yours. Those are theirs. I guess the best way to answer that, Your Honor, is to say that my client has a very strong religious belief that this logo that was designed by the previous Rebbe that has been used on its works of religious scholarship, that this is the mark of the Rebbe, that it designates to the world that the Rebbe has approved the content of the book. I'm not saying you'd have to abandon entirely the aspects of the mark that designate that, but that the use of it be accompanied by some additional thing that permits a distinction. If I may, Your Honor, what my adversary omitted to show you was what we actually do, which is inside the flyleaf of the book, there's a watermark that says BAD across it. Says what? BAD. My client's . . . identifies my client. You used the logo and your trade name. Yes. That's correct. Trade name together with the logo. Would you pass that up, please? Yeah. Could I ask you this? Would survey evidence be admissible to show likelihood of confusion? You hear that? Yeah. So, survey evidence would have been very useful in this case. I just want to know . . . Yeah, well, to show secondary meaning for the strength of the mark. Would it involve hearsay? I think it always does. It's a study of . . . That's what I'm wondering. Yeah. So, I'm wondering further whether hearsay is an objection to evidence offered to show likelihood of confusion. Well, like I said, maybe hearsay is not . . . Hearsay is admissible to show state of mind. That's the exception that's been used. So, if somebody is confused, that's a state of mind, and they can . . . Maybe it's not hearsay. But it still . . . It may not be hearsay, but it still has to be probative. It still has to go to the issue in the case, not just whether somebody is randomly confused, but they're confused about the source of the product based on the use of the trademark, which is not shown. What you say is the standard that courts should use for determining when a laches defense is defeated, other than bad faith. Let's put bad faith aside because there's been a finding of good faith. So, other than that, what's the standard in the area of confusion, actual likelihood, whatever? How do you frame what you think is the right standard? Well, I would say the right standard is because the party has abandoned . . . It's not abandoned, but has sat on its rights. It is no longer entitled for the court's consideration of its private interests. The only thing that matters is confusion that affects public interest. And so, if it were me, I would adopt something along with the Ninth Circuit did, which is saying, is there any harm that's going to come to a consumer in this case with these two . . . A consumer not my adversary. We don't care about them anymore. They sat on their rights. A consumer who buys an identical book because of the logo, the same exact content, is not going to be injured in this case. That is the essence. Is that another way of saying likelihood of confusion? No. I would say confusion that affects the health and safety of the public. Must it be confusion as to the source of . . . Yeah. It has to be confusion based on the source identification of the trademark. And your argument is that it doesn't stand with any evidence. There's no evidence that anybody was confused based on the Kehoe logo. Well, now you're talking about actual confusion when you say that anyone was confused. But as to likelihood of confusion, is there evidence of likelihood of confusion as to source? I would say no, because in our view, the district court got it wrong on reconsideration that the mark is not a strong mark by trademark standards. It's not a strong mark. So if you were to win on that aspect of your appeal, we'd be left with his original finding that it was not strong and there was sufficient third-party usage. It was significant. Yeah. I don't know that . . . Not authorized, but tolerated for years. Yeah. We don't . . . Exactly. Well, we don't agree that it was authorized, at least in some cases. These are certainly third parties. I'm going to suggest not authorized. But even without that finding of third-party usage, the third-party usage evidence was, we think, was sufficient. But even without that, you can still find that it's not a strong mark because the way that it has been used historically is to associate the work with the philosophy of the Lobovitchers and not with this organization, Mercos. Would you remind me when you started using the mark? 1967. Sixty? Yeah. Thank you. Your time has expired. Thank you. We'll hear from Mercos for two minutes. I want to briefly address two points. First of all, on this issue of actual confusion, I don't think I need to remind the court that this court has said repeatedly and in other courts as well that likelihood, actual confusion is just one of the Polaroid factors that the court considers. And routinely, the court finds and other courts, district courts. Well, just a minute. It's one of the factors in deciding. Likelihood of confusion. Infringement. Yes, for infringement. But we're well beyond that in this stage of the argument. I understand. Now we're talking about the test for getting to overcoming a latches defense. With respect to infringement, is my point, the courts have always said that the absence of evidence of actual confusion does not matter, especially in a case like this where you've got the identical marks. In deciding the original infringement. Yes. With respect to the question of whether or not now all of a sudden there's this added hurdle. You have to show actual confusion in order to show inevitable confusion. That hasn't been decided by this court. I acknowledge that. Well, is it a hurdle or is it a way for you to overcome a latches defense? They've been selling this since 1967, we were just informed. Well, you have to understand. In 1967, they were given permission by Merkos when the Rebbe was still alive to produce these works. When the Rebbe died in . . . I'm just quarreling a little bit with your saying it's a hurdle when you're the one who's late, according to the district court. Yes. I was just saying . . . The question is, do you have a defense to lateness? Yes. That's the issue, isn't it? We believe we do. What this all circles back to in the end is that they don't really dispute that this trademark designates a single source. They don't really dispute the power of this logo. What they dispute is who owns it. Just a minute. He just did. I don't know if you . . . At least I took it that that's exactly what he was disputing. He says it doesn't in any way direct the buyer to your company or your ownership. It directs them to the spiritual authorization of the former Rebbe. The nuance of my . . . He says that's what it directs them to. Yes. So the nuance of my argument is this. There's no dispute that this designates a single source. What they're disputing is what is that source. Their position is that this acts as some kind of symbol of the Rebbe, a certification mark, they argue to the board, and not as a designator of Mercos as a source of these publications. That argument was categorically rejected by the TTAB, categorically rejected by Judge Block in his initial summary judgment decision. For 75 years, this has been used not as a certification mark, as a trademark on books sold by my client. It was registered for 30 years as a New York State trademark by the Rebbe himself when he was president of Mercos. It has always functioned as a trademark. Their argument is we are in good faith. There is no inevitable confusion because this is a religious symbol that we should have. In fact, they say it is important for us. Judge LaValle's question is how would you be harmed if you couldn't use this logo? The way that they would be harmed is they can no longer associate their religious views with Mercos, the official publication arm of the Chabad Lubavitch movement. What we haven't addressed is the way in which these books are, according to my client, offensively produced by not acknowledging the Rebbe's passing with the traditional of blessed memory that is used in connection with someone who is deceased. They want to associate their view that the Rebbe is not deceased with this mark. They acknowledge in their pleadings that that is what they want to do. They claim a religious right to do it. They are not saying that this mark doesn't designate a single source. They are saying the source is the Rebbe, not Mercos. What I am saying is the court is bound to apply the secular law. This, as the TTAB found and as Judge Block initially affirmed, is a trademark. It always has been a trademark and it designates Mercos publications. In fact, we didn't know until the trial itself evolved that we were even going to be trying the issue of likelihood of confusion. This was something that came up during the trial. The trial was about latches. Then during the course of the trial, Judge Block, in the colloquy that's been cited in our briefs, said, well, wait a minute. Doesn't everyone really know about this religious dispute? Don't they really have the ability to determine which book is yours and which book is theirs? He examined Rabbi Krinsky, who is the chief executive officer of Mercos, about this. Rabbi Krinsky conceded, yes, there are many who do know, who can figure out if they go to this page, five pages into the book, and they look carefully, underneath the Quixote logo, and they see Vod's name instead of the Quixote name. Remember, for years, these books were published under license granted by Mercos on condition that they said, you use the logo and you say published and copyrighted by the Quixote Publication Society. They changed that. What's the remedy you seek here? Only to stop. We didn't seek any past damages for infringement. What's the remedy you want us to issue? We want you to vacate the district court's denial of our request for permanent injunction, and we want a permanent injunction prospectively that prohibits them from using the Quixote logo on their publications. You want us to direct the issuance of the injunction? Yes, we do. That's your more extreme . . . Yes, that is our extreme position, Your Honor. Intermediate to that is you want us to vacate the district judge's ruling because of legal errors. In that case, we would have to retry, I suppose, the question of latches. I think that as a matter of law . . . This was not a jury trial, right? No, because we sought no damages. You don't have to retry anything. You have to have the district judge apply correct legal rules as opposed to incorrect ones to consider what the outcome should be. I believe that's right, Your Honor. I apologize. I think that's the way it would proceed in the district court. On the record already made? On the record already made, but we believe the court has the power on the right given the argument that this is inevitably going to be confused as a matter of law and that they've never operated in good faith, that the district court erred as a matter of law in ever deciding that bad faith barred them from invoking the doctrine of latches. Wait a minute. When you just said that, do you mean erred in finding good faith or erred in thinking that good faith mattered? What this court said in the Ermey's case is if there's intentional infringement, it's not a matter of weighing the bad faith as a factor. I'm just trying to understand what you're saying is error. Did he err in his finding that there was good faith or did he err in thinking that good faith mattered? We think he erred at the doorstep in deciding that bad faith should be weighed as a factor. At all? At all. Okay. And then we think he weighed it improperly that the evidence here because they claim a religious right, his fact finding was clearly erroneous. Thank you. Thank you, Your Honor. Thank you both. We'll reserve.